IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA E. MONTANEZ, | ) | CASE NO. 1:13 CV 614 |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## Introduction

Before me by referral[1] is an action by Sandra E. Montanez under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental security income.[2] The Commissioner has answered[3] and filed the transcript of the administrative record.[4] Under my initial[5] and procedural[6] orders, the

---

[1] This matter was referred to me under Local Rule 72.2 in a marginal entry order dated March 21, 2013.

[2] ECF # 1.

[3] ECF # 12.

[4] ECF # 13.

[5] ECF # 7.

[6] ECF # 15.

parties have briefed their positions[7] and filed supplemental charts[8] and the fact sheet.[9] They have participated in a telephonic oral argument.[10]

For the reasons set forth below, I will recommend finding that the decision of the Commissioner is not supported by substantial evidence and that the matter be remanded for further proceedings.

## Facts

**A.** **Background facts and decision of the Administrative Law Judge ("ALJ")**

Montanez, who was 43 years old at the time her application was filed,[11] has an eleventh grade education,[12] lives alone without a current driver's license,[13] and previously worked as a waitress, cook and in a fast-food service restaurant.[14] She has experienced seizures since being involved in a motor vehicle accident "years ago" and was more recently

---

[7] ECF # 26 (Commissioner's brief); ECF # 18 (Montanez's brief), ECF # 27 (Montanez's reply brief).

[8] ECF # 26-1 (Commissioner's charts); ECF # 18-2 (Montanez's charts).

[9] ECF # 18-1 (Montanez's fact sheet).

[10] ECF # 28.

[11] ECF # 13, Transcript ("Tr.") at 26.

[12] *Id.* at 146.

[13] *Id.* at 21.

[14] *Id.* at 148.

treated for abuse of heroin and crack cocaine in 2000.[15] She has also been receiving "relatively regular" treatment for bipolar disorder since 2009.[16]

The ALJ, whose decision became the final decision of the Commissioner, found that Montanez had the following severe impairments: history of seizures, acute cholecystitis, bi-polar [sic] disorder, opiod [sic] dependence in full remission, cocaine dependence in full remission, and cannabis abuse.[17]

After concluding that these impairments did not meet or equal a listing,[18] the ALJ made the following finding regarding Montanez's residual functional capacity ("RFC"):

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant can never climb ladders, ropes, or scaffolds, and she should avoid all exposure to hazards such as moving machinery and unprotected heights. The claimant is further limited to work that requires only simple and routine tasks in a static environment that has limited social contact with co-workers, supervisors, and the public.[19]

The ALJ then decided, with the assistance of testimony from the vocational expert ("VE"), that this residual functional capacity precluded Montanez from performing her past relevant work.[20]

---

[15] *Id.* at 17.

[16] *Id.* at 18.

[17] *Id.* at 17.

[18] *Id.* at 18.

[19] *Id.* at 20.

[20] *Id.* at 26.

Based on an answer to a hypothetical question posed to the VE at the hearing setting forth the RFC finding quoted above, and after noting that there was no transferability of skills, the ALJ determined that a significant number of jobs existed locally and nationally that Montanez could perform.[21] The ALJ, therefore, found Montanez not under a disability.[22]

## B.      Issues on judicial review

Montanez asks for reversal of the Commissioner's decision on the ground that it does not have the support of substantial evidence in the administrative record. Specifically, Montanez presents the following eight issues for judicial review:

- The RFC (residual functional capacity) finding lacks substantial evidence and deprives the step-five (other work) finding of support because the decision does not adequately evaluate treating psychiatrist Dr. Abraham's report of marked limitations in claimant's ability to be around others without being distracted and to sustain attention and concentration for extended periods.

- The RFC finding lacks substantial evidence and deprives the step-five finding of support because the decision fails even to mention treating psychiatrist Dr. Abraham's report of moderate limitations in basic mental work demands.

- The RFC finding lacks substantial evidence and deprives the step-five finding of support because the decision does not adequately evaluate the later treating psychiatrist Dr. Saini's report of marked limitations in claimant's abilities in such areas as keeping a regular work schedule and in withstanding the stresses of simple routine work.

---

[21] *Id.* at 27-28.

[22] *Id.* at 28.

-4-

- The RFC finding lacks substantial evidence and deprives the step-five finding of support because the RFC is based in part on "improvement" in claimant's condition, without considering a lower RFC before the improvement.

- The RFC finding lacks substantial evidence and deprives the step-five finding of support because the RFC is based in part on improper presumptions about the RFC level supposedly needed to have a boyfriend and get rides to appointments.

- The RFC finding lacks substantial evidence and deprives the step-five finding of support because the RFC finding is based in part on improper consideration of past drug use.

- The step-five finding of the incidence of jobs in the economy lacks support because the finding is based on improper use of a nine-state "region" as the region where the claimant lives.

- The step-five finding of the incidence of jobs in the economy lacks support because the vocational expert misunderstood the ALJ's question.[23]

For the reasons that follow, I will conclude that the ALJ's finding of no disability is not supported by substantial evidence and, therefore, that this matter be remanded.

## Analysis

**A.    Standards of review**

**1.    *Substantial evidence***

The Sixth Circuit in *Buxton v. Halter* reemphasized the standard of review applicable to decisions of the ALJs in disability cases:

---

[23] ECF # 18 at 1-2.

-5-

Congress has provided for federal court review of Social Security administrative decisions. 42 U.S.C. § 405(g). However, the scope of review is limited under 42 U.S.C. § 405(g): "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." In other words, on review of the Commissioner's decision that claimant is not totally disabled within the meaning of the Social Security Act, the only issue reviewable by this court is whether the decision is supported by substantial evidence. Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.[24]

Viewed in the context of a jury trial, all that is necessary to affirm is that reasonable minds could reach different conclusions on the evidence. If such is the case, the Commissioner survives "a directed verdict" and wins.[25] The court may not disturb the Commissioner's findings, even if the preponderance of the evidence favors the claimant.[26]

I will review the findings of the ALJ at issue here consistent with that deferential standard. The relevant evidence from the administrative record will be discussed in detail as part of the following analysis.

---

[24] *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted).

[25] *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986); *Tucker v. Comm'r of Soc. Sec.*, No. 3:06cv403, 2008 WL 399573, at *6 (S.D. Ohio Feb. 12, 2008).

[26] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

## 2.    *Treating physician rule and good reasons requirement*

The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances.

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.[27]

If such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight.[28]

The ALJ has the ultimate responsibility for determining whether a claimant is disabled.[29] Conclusory statements by the treating source that the claimant is disabled are not entitled to deference under the regulation.[30]

The regulation does cover treating source opinions as to a claimant's exertional limitations and work-related capacity in light of those limitations.[31] Although the treating

---

[27] 20 C.F.R. § 404.1527(d)(2).

[28] *Id.*

[29] *Schuler v. Comm'r of Soc. Sec.*, 109 F. App'x 97, 101 (6th Cir. 2004).

[30] *Id.*

[31] *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 991 (N.D. Ohio 2003), citing *Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2nd Cir. 2003).

source's report need not contain all the supporting evidence to warrant the assignment of controlling weight to it,[32] nevertheless, it must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" to receive such weight.[33] In deciding if such supporting evidence exists, the Court will review the administrative record as a whole and may rely on evidence not cited by the ALJ.[34]

In *Wilson v. Commissioner of Social Security*,[35] the Sixth Circuit discussed the treating source rule in the regulations with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination.[36] The court noted that the regulation expressly contains a "good reasons" requirement.[37] The court stated that to meet this obligation to give good reasons for discounting a treating source's opinion, the ALJ must do the following:

- State that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record.

- Identify evidence supporting such finding.

---

[32] *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).

[33] *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001).

[34] *Id.* at 535.

[35] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

[36] *Id.* at 544.

[37] *Id.*, citing and quoting 20 C.F.R. § 404.1527(d)(2).

-8-

- Explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion.[38]

The court went on to hold that the failure to articulate good reasons for discounting the treating source's opinion is not harmless error.[39] It drew a distinction between a regulation that bestows procedural benefits upon a party and one promulgated for the orderly transaction of the agency's business.[40] The former confers a substantial, procedural right on the party invoking it that cannot be set aside for harmless error.[41] It concluded that the requirement in § 1527(d)(2) for articulation of good reasons for not giving controlling weight to a treating physician's opinion created a substantial right exempt from the harmless error rule.[42]

The Sixth Circuit in *Gayheart v. Commissioner of Social Security*[43] recently re-emphasized that the regulations require two distinct analyses, applying two separate standards, in assessing the opinions of treating sources.[44] This does not represent a new interpretation of the treating physician rule. Rather it reinforces and underscores what that

---

[38] *Id.* at 546.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (2013).

[44] *Id.* at 375-76.

court had previously said in cases such as *Rogers v. Commissioner of Social Security*,[45] *Blakley v. Commissioner of Social Security*,[46] and *Hensley v. Astrue*.[47]

As explained in *Gayheart*, the ALJ must first consider if the treating source's opinion should receive controlling weight.[48] The opinion must receive controlling weight if (1) well-supported by clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the administrative record.[49] These factors are expressly set out in 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). Only if the ALJ decides not to give the treating source's opinion controlling weight will the analysis proceed to what weight the opinion should receive based on the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (3)-(6) and §§ 416.927(c)(2)(i)-(ii), (3)-(6).[50] The treating source's non-controlling status notwithstanding, "there remains a presumption, albeit a rebuttable one, that the treating physician is entitled to great deference."[51]

---

[45] *Rogers*, 486 F.3d at 242.

[46] *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406-07 (6th Cir. 2009).

[47] *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009).

[48] *Gayheart*, 710 F.3d at 376.

[49] *Id.*

[50] *Id.*

[51] *Rogers*, 486 F.3d at 242.

-10-

The court in *Gayheart* cautioned against collapsing these two distinct analyses into one.[52] The ALJ in *Gayheart* made no finding as to controlling weight and did not apply the standards for controlling weight set out in the regulation.[53] Rather, the ALJ merely assigned the opinion of the treating physician little weight and explained that finding by the secondary criteria set out in §§ 1527(c)(i)-(ii), (3)-(6) of the regulations,[54] specifically the frequency of the psychiatrist's treatment of the claimant and internal inconsistencies between the opinions and the treatment reports.[55] The court concluded that the ALJ failed to provide "good reasons" for not giving the treating source's opinion controlling weight.[56]

> But the ALJ did not provide "good reasons" for why Dr. Onady's opinions fail to meet either prong of this test.

> To be sure, the ALJ discusses the frequency and nature of Dr. Onady's treatment relationship with Gayheart, as well as alleged internal inconsistencies between the doctor's opinions and portions of her reports. But these factors are properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight.[57]

In a nutshell, the *Wilson/Gayheart* line of cases interpreting the Commissioner's regulations recognizes a rebuttable presumption that a treating source's opinion should

---

[52] *Gayheart*, 710 F.3d at 376.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

receive controlling weight.[58] The ALJ must assign specific weight to the opinion of each treating source and, if the weight assigned is not controlling, then give good reasons for not giving those opinions controlling weight.[59] In articulating good reasons for assigning weight other than controlling, the ALJ must do more than state that the opinion of the treating physician disagrees with the opinion of a non-treating physician[60] or that objective medical evidence does not support that opinion.[61]

The failure of an ALJ to follow the procedural rules for assigning weight to the opinions of treating sources and the giving of good reason for the weight assigned denotes a lack of substantial evidence even if the decision of the ALJ may be justified based on the record.[62] The Commissioner's *post hoc* arguments on judicial review are immaterial.[63]

Given the significant implications of a failure to properly articulate (*i.e.*, remand) mandated by the *Wilson* decision, an ALJ should structure the decision to remove any doubt as to the weight given the treating source's opinion and the reasons for assigning such weight. In a single paragraph the ALJ should state what weight he or she assigns to the treating source's opinion and then discuss the evidence of record supporting that assignment.

---

[58] *Rogers*, 486 F.3d 234 at 242.

[59] *Blakley*, 581 F.3d at 406-07.

[60] *Hensley*, 573 F.3d at 266-67.

[61] *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551-52 (6th Cir. 2010).

[62] *Blakley*, 581 F.3d at 407.

[63] *Wooten v. Astrue*, No. 1:09-cv-981, 2010 WL 184147 (N.D. Ohio Jan. 14, 2010).

Where the treating source's opinion does not receive controlling weight, the decision must justify the assignment given in light of the factors set out in §§ 1527(d)(1)-(6).

The Sixth Circuit has identified certain breaches of the *Wilson* rules as grounds for reversal and remand:

- the failure to mention and consider the opinion of a treating source,[64]

- the rejection or discounting of the weight of a treating source without assigning weight,[65]

- the failure to explain how the opinion of a source properly considered as a treating source is weighed (*i.e.*, treating v. examining),[66]

- the elevation of the opinion of a nonexamining source over that of a treating source if the nonexamining source has not reviewed the opinion of the treating source,[67]

- the rejection of the opinion of a treating source because it conflicts with the opinion of another medical source without an explanation of the reason therefor,[68] and

- the rejection of the opinion of a treating source for inconsistency with other evidence in the record without an explanation of why "the treating physician's conclusion gets the short end of the stick."[69]

---

[64] *Blakley*, 581 F.3d at 407-08.

[65] *Id.* at 408.

[66] *Id.*

[67] *Id.* at 409.

[68] *Hensley*, 573 F.3d at 266-67.

[69] *Friend*, 375 F. App'x at 551-52.

The Sixth Circuit in *Blakley*[70] expressed skepticism as to the Commissioner's argument that the error should be viewed as harmless since substantial evidence exists to support the ultimate finding.[71] Specifically, *Blakley* concluded that "even if we were to agree that substantial evidence supports the ALJ's weighing of each of these doctors' opinions, substantial evidence alone does not excuse non-compliance with 20 C.F.R. § 404.1527(d)(2) as harmless error."[72]

In *Cole v. Astrue*,[73] the Sixth Circuit reemphasized that harmless error sufficient to excuse the breach of the treating source rule only exists if the opinion it issues is so patently deficient as to make it incredible, if the Commissioner implicitly adopts the source's opinion or makes findings consistent with it, or if the goal of the treating source regulation is satisfied despite non-compliance.[74]

## B.    Application of standards

The issues on review center on the opinion of Dr. Abraham, a psychiatrist who, the ALJ noted, "saw the claimant for a few months."[75] As the ALJ also noted, Dr. Abraham opined that Montanez was "markedly limited in her ability to sustain attention and

---

[70] *Blakley*, 581 F.3d 399.

[71] *Id.* at 409-10.

[72] *Id.* at 410.

[73] *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011).

[74] *Id.* at 940.

[75] Tr. at 24.

-14-

concentration for extended periods as well as her ability to be around others without being distracted."[76] Nonetheless, without identifying Abraham as a treating source or performing the required analysis, the ALJ ascribed only "little weight" to that opinion, stating that it was based on symptoms Dr. Abraham expected to last only 9 to 11 months, and was otherwise only "partially" consistent with the other evidence of record.[77]

Montanez argues that the ALJ's analysis is deficient on several levels if it is assumed that the ALJ was considering the opinion of a treating source. Initially, however, she notes that the ALJ did not characterize Dr. Abraham as a treating source or as any other kind of medical source, but merely recounted that Dr. Abraham saw Montanez for an unspecified number of times over a space of "a few months."[78]

In this regard, the regulations and case authority detailed above describe different analytical paths for considering the weight to be assigned a medical source depending on whether or not that source is a treating source. As noted earlier, in the case of a treating source, the analysis begins with a rebuttable presumption that the medical opinion of such a source is entitled to controlling weight. (Essentially, the first step of the two-step *Gayheart* inquiry is the required analysis for testing that presumption.) Only after that presumption of controlling weight is rebutted in the first step is the opinion, now without any presumption of weight, subjected to a second level of analysis to determine the correct weight to assign.

---

[76] *Id.* at 24-25.

[77] *Id.* at 25.

[78] ECF # 27 at 2-3.

In cases where the opinion does not come from a treating source, there is no presumption of controlling weight to be addressed and thus no first level of *Gayheart* analysis, but rather the analysis of opinions of non-treating sources properly does not consider the question of rebutting a presumption of controlling weight but moves directly to the question of what weight to assign.

The regulations define a treating source as "an acceptable medical source" who provides the claimant with treatment or evaluations and who has or had "an ongoing treatment relationship" with the claimant.[79] The regulations further state an ongoing treatment is demonstrated when the "medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition."[80] The regulation itself further precludes finding that an ongoing treating relationship can be created by a claimant seeing the source "solely on your need to obtain a report in support of your claim for disability."[81]

But beyond that, the regulations, as noted, look to the accepted medical practice for the type of treatment involved or the type of evaluation sought as these pertain to the claimant's medical condition as the means for determining whether the contact between a claimant and the medical source is sufficient to make that source a treating source. In that regard, and of particular relevance in the area of managing psychological impairments, courts

---

[79] 20 C.F.R. §§ 416.902, 404.1502.

[80] *Id.* at § 404.1502

[81] *Id.*

-16-

have noted that the accepted medical practice is that a psychiatrist may prescribe and manage medications while not seeing a patient with any regularity, instead basing the treatment prescribed on routinely receiving reports and evaluations from others who provide the "hands-on" interaction with the patient.[82]

With that accepted medical practice in mind, the Ninth Circuit has stated that the regulations defining a treating source "neither explicitly forbid[] or require" assigning that status to a physician who actually sees the claimant "a few times" or "as little as twice a year."[83] Rather, as the text of the regulation itself explicitly states, the test is whether the source has seen the claimant with the frequency medically required by the treatment or evaluation at issue in the context of the claimant's impairment. Thus, merely taking note of the number of visits by itself is not enough to show either that the contacts are sufficient to establish a treating relationship or that conclusively they are not.[84]

Here, Dr. Abraham appears to have initially performed a psychiatric evaluation of Montanez in November, 2009.[85] He prepared the opinion at issue as a result of that initial

---

[82] *See*, *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003).

[83] *Id.*

[84] *Id.*

[85] Tr. at 488-89.

evaluation[86] although the date that opinion was prepared is not apparent.[87] The record further shows that Dr. Abraham recorded notes from a visit with Montanez on April 5, 2010, when he observed that Montanez "may elect to see another psychiatrist" or "transfer to another MD" because Montanez wanted medication Dr. Abraham was not prescribing.[88] Moreover, the record also contains notes from a visit Montanez had with a nurse on December 21, 2009, wherein the nurse records that she "shared with her what Dr. Abraham said" about her medication, and further noted that "she sees him 12/24/09."[89] A progress note signed by Dr. Abraham dated December 24, 2009, states that as a result of an in-person contact with Montanez, she "[a]ffirms understanding [of the course of treatment] and expresses intent to proceed as discussed."[90]

Montanez and the Commissioner now argue about whether Dr. Abraham saw Montanez five or six times,[91] but there is no analysis by the parties – or by the ALJ – concerning the number or frequency or nature of visits required by the accepted medical

---

[86] *Id.* at 567.

[87] The Commissioner's chart indicates that the opinion was prepared November 11, 2009. ECF # 26-1 at 7. However, the document itself does not have a place to show the date for its preparation and signature but merely has a place where the preparer can indicate the "date of last exam." Tr. at 567.

[88] Tr. at 569.

[89] *Id.* at 495.

[90] *Id.* at 494.

[91] *See*, ECF # 27 at 3.

practice applicable to Montanez's condition such as would afford Dr. Abraham the status of a treating source. Further, as the nursing note cited above shows, there is no discussion concerning how Dr. Abraham may have used other providers to either communicate with Montanez or as a means of receiving information about Montanez.

Thus, although the record seems to show, as discussed above, that Abraham was probably a treating source, the lack of a definitive finding by the ALJ in this regard, made in light of the applicable standards cited above, now precludes any meaningful judicial review of that issue.

But, regardless of whether or not Dr. Abraham is a treating source, the two reasons given by the ALJ for assigning his opinion little weight are not good reasons.

First, as Montanez points out, the fact that Dr. Abraham opined that Montanez's symptoms were expected to last between 9 and 11 months does not take into account when the symptoms may have begun prior to the report, nor does it show, of itself, that the symptoms actually abated when they were expected to subside.[92] More importantly, if the evidence of record conclusively established that the forecast length of Montanez's symptoms was totally accurate, this would seem to indicate that Dr. Abraham's opinion should be entitled to great weight as coming from an expert diagnostician of the future course of Montanez's condition.

---

[92] Tr. at 25.

Second, the ALJ commented that Dr. Abraham's opinions were entitled to less weight for being "only partly consistent" with "the objective evidence in the record as well as the claimant's testimony."[93] In fact, in the subsequent discussion by the ALJ in the opinion, the only purported inconsistencies with Dr. Abraham's opinion cited by the ALJ arise from Montanez's testimony that she can go to church, be around her family and boyfriend, and get help with transportation from others "when she requires it."

None of these examples relate to "objective evidence in the record" but deal solely with "the claimant's testimony."[94] Further, every example here is that of a purely social or family situation or circumstance which, unlike a job setting, Montanez can excuse herself from or limit her involvement with if she chooses. As such, these examples from Montanez's testimony are not obviously inconsistent with Dr. Abraham's opinion that Montanez is markedly limited in her "ability to *work* in coordination with or proximity to others without being distracted by them."[95]

Thus, for the above reasons, I recommend finding that the ALJ here has not provided any good reasons for according Dr. Abraham's opinion little weight.

As such, and as has been discussed above, I recommend finding that the ALJ's entire treatment of Dr. Abraham's opinion does not conform to the applicable standards. Therefore,

---

[93] *Id.*

[94] In noting this, I do not suggest finding that no objective evidence in the record can be produced to conflict with Dr. Abraham's opinion but only note that having stated that such evidence exists, the ALJ did not specifically cite any.

[95] *See*, Tr. at 567 (emphasis added).

on that basis, I recommend a remand so that an appropriate review can be conducted. As Montanez makes clear in her other issues here, a remand on this basis is needed because Dr. Abraham's opinion, if more greatly credited, may have significant impact on any subsequent RFC and so on the ultimate decision as to disability.

## Conclusion

For the above-stated reasons, I recommend finding that substantial evidence does not support the finding of the Commissioner that Montanez had no disability. Accordingly, I recommend that the matter be remanded for further proceedings consistent with this opinion.

Dated: December 17, 2013                         s/ William H. Baughman, Jr.
                                                 United States Magistrate Judge

## Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order.[96]

---

[96] *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also*, *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).